# IN THE
# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>SANTO LOZOYA, )<br>)<br>Defendant. ) | No. 19 CR 357<br>Judge Matthew F. Kennelly |

## DEFENDANT'S SENTENCING MEMORANDUM

NOW COMES the Defendant, Santo Lozoya, by and through his attorneys, Keith Spielfogel and James Graham, and submits the following sentencing memorandum:

### A. Revisions to the PSR

1. The government and defense agree that Paragraph 17 on page 6 of the PSR should be changed to read:

> Special Agent Fee learned through interviews of Martinez that the defendant, Martinez, and Individual A retrieved additional firearms from the safe house because they encountered rival gang members in the parking lot and might see them again.

2. In paragraph 76, page 17: Yandel Cuevas was born on March 2, 2017, six days before Santo Lozoya went into custody in this case.

3. On page 3: Education: Instead of unknown it should read GED.

1

### B. Application of Title 18 Section 3553(a) Factors

Counsel is certain the Court is well familiar with the case law regarding the application of the factors set forth in 18 U.S.C. 3553(a) affording it great discretion in determining what constitutes a fair and just sentence in the case of Santo Lozoya . For that reason we will turn our attention directly to a discussion of the factors contained in 3553(a) and to additional factors present in this case that we believe the court should consider in arriving at its sentencing decision.

**3553. Imposition of a sentence**

**(a) Factors to be considered in imposing a sentence.**

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed shall consider—

**(1) the nature and circumstances of the offense and the history and characteristics of the defendant;**

    a. The offense

Santo Lozoya has pled guilty to the superseding information charging him with conspiracy to commit racketeering. A conspiracy he joined as a youth. The Milwaukee Kings (hereinafter referred to as "MKs") Conspiracy is laid out fully on pages 3-7 of the Plea Agreement. The specific act committed by Mr. Lozoya that has led to the 30-35 year sentencing range agreement is the murder of Crispin Coliz. The details of that murder are set forth on pages 7-9 of the Plea Agreement. Mr. Lozoya in his letter to the court expressed his genuine remorse for his actions as a member of the charged conspiracy and especially as a participant in the murder of Crispin Coliz. He asks and prays that in time the Coliz family may find it possible to forgive him.

2

b. History and characteristics of the defendant

This case was indicted as a potential death penalty case. As a result of the death eligible charge, and in order to make a comprehensive submission to the Department of Justice requesting that the Attorney General not seek the death penalty, counsel were authorized to obtain the services of a mitigation specialist. Working with that specialist the defense was able to develop a broad-based background of Santo Lozoya's young life. Portions of that submission were provided to Probation Officer Kelly Kwong and were incorporated into the PSR. Below is a summary of Santo Lozoya's young life:

Santo Lozoya was born on August 5, 1997. He is now 23 years old. He was raised by his mother Santa and his father Hilario. Also in the home were his two older sisters, Kassandra "Kassie" Lozoya and Isabel Lozoya.

Santo's parents have been together for almost 30 years. When Santo was born, they had already been together for five years. Santo's mother Santa has worked for the City of Chicago Street and Sanitation Department for over 20 years. She is an Assistant Division Superintendent. Santo's father Hilario worked at the Walgreen's supply warehouse for eleven years until the warehouse closed. He currently works for Auto Zone. While his parents' work brought more economic security, it was not enough for the family to move from their neighborhood.

Because Santo's parents both worked steady jobs, Santo's maternal grandmother Ana played a large role in his life and was an additional mother figure for him and his two older sisters. Ana lived with Santo's family when Santo and his sisters were young. By the time Santo was in the fourth grade, Ana had moved into her own

3

home on the same block. Ana still cared for Santo after school, and he went to her house after school until his parents came home from work. Ana was protective of Santo and, because their neighborhood was dangerous, she worried about Santo when he was even five minutes late.

As a young boy, baseball was the focus of Santos' life. He was a star. He played baseball from the age of five years old through eighth grade, with his father as his coach. When he was 11 years old, his team won its way to the national tournament finals in Cooperstown, New York. His team came in second place.

While Santo experienced success on the baseball field, he struggled and experienced humiliation in school. Santo couldn't count or read well. He wrote some numbers and letters backwards. On every standardized test throughout his school career, he scored worse in reading than almost 60% of students who took the test. He read below grade level every year.

At the end of his third-grade year, Santo was tested. It was determined that he had a learning disability. He qualified for special education services. Despite receiving special-education services, Santo's reading scores never surpassed the 42nd percentile. In fifth grade he was placed in a class for children who were not native English speakers called "English Language Learners." But Santo's and both his parents' first language is English. School records incorrectly indicate that Santos' language was Spanish.

In sixth grade, the school assessed Santo and concluded that he no longer qualified to receive special education services. This decision was based on his receiving

4

average grades. It was made despite his below grade-level reading performance. Simply put, the school did not give Santo the support he needed to do well or to feel like he could find success in school. He eventually sought self-respect and acceptance elsewhere.

It is interesting to note that both of his sisters had a different experience in school which led to quite different academic outcomes. His sister, Isabelle, received special education services that met her needs from third through eighth grades. She is currently in her final year of working on her Masters Degree in psychology from the University of Springfield and is working in the Chicago Public School system. His other sister, Kassie, attributes her success as a first-generation college student to having teachers who believed in her and supported her throughout school. She has a Masters Degree in special education and works as a special education teacher in the Chicago Public Schools. Both sisters relate that Santo received practically none of the support they received and attribute that fact to the early difficulties experienced by Santo.

Santo's neighborhood was dangerous. He often heard gun shots walking home from school. When Santo was 13 years old, his neighborhood ranked in the top 45% of Chicago police districts for murders. In an article in the April, 2012, Chicago Reader, the neighborhood was described as "awash in drugs and crime" and one resident said, "It's [criminal activity] right in your face."

When Santo was about 11 years old, he was chased by gang members. He learned from a young age that he could be threatened by the gangs or join them. Santo needed a peer group to provide him safety.

Santo witnessed the shooting of his sister's friend Eric when he was 12 years

5

old. Eric was also a neighbor and someone to whom Santo looked up to. On this afternoon, Santo was walking home with his sisters when he saw Eric get shot and was only feet away. The shooting itself was not unusual for their neighborhood, but the fact that they were so close made an impression on both Santo and his sisters.

Santo attended Northwest Middle School from sixth through eighth grades. Northwest was known for having a good deal of gang activity. Santo's eighth grade teacher, Leticia Orzoco, reported that the school lacked social service supports for the students. She said many parents worked full-time and had trouble keeping their children from joining gangs; joining a gang was something many of the boys at Northwest did. By eighth grade, Santo started to put limited effort into school. The school hadn't ensured that Santo had the foundational knowledge to be successful. Ms. Orzoco reported that Santo was disengaged in her class. She couldn't tell what he understood, because he tuned out in class. She described him as a follower rather than as a leader.

The court is in receipt of a letter from Santo's middle school principal, Marilyn Strojny. She describes Santo as a very polite, somewhat shy young man. She relates how he had an opportunity to receive a baseball scholarship at a top high school, Gordon, but that he lost that scholarship when he couldn't attend summer baseball at the school because he needed to attend summer school to improve his grades.

With Gordon High out of the picture, Santo's mom wanted Santo and his sister Isabel, who were in the same grade, to go to a better high school than their neighborhood school, Foreman. Foreman was known to have a lot of gang activity, and a school where the threat of violence was ever-present. Isabel applied and got into Prosser High School, which had a better reputation. Prosser had a 20-point higher

6

graduation rate than Foreman; students' overall performance on all state tests was 20 points higher at Prosser than Foreman; and 83% of Foreman juniors versus 65% of Prosser juniors read below standards/academic warning. Santo's grades weren't high enough to follow his sister, so he was enrolled at Foreman.

At Foreman High School, Santo saw veteran gang members and young high school boys gaining safety and comradery through gang membership. As Ms. Strojny noted in her letter, "Being the shy freshman that he was, and gangs at that neighborhood high school seeking new members, Santos became a prime subject of their attention." It wasn't long after Santo began to attend Foreman that he joined a gang. He felt family ties with fellow members of the gang. His main concern became the gang and schoolwork became an afterthought. He skipped class and earned only one credit his first year of high school. He eventually left high school after two years.

Santo has been in custody for the Crispin Coliz murder since he was 19 years old. He was arrested on March 8, 2017. While Santo made dangerous choices as a youth, he is maturing and his susceptibility to negative influences has greatly changed as has his sense of responsibility. Counsel believe that Santo's turn towards maturity is reflected in the letter he submitted to the court.

Even before his arrest, Santo questioned gang life and told his grandmother Ana that he was sorry for his gang involvement, but he did not know how to get out. He wanted out, but he was afraid he could be killed.

The letters from his family members evidence the strong support Santo continues to have from his immediate family. He calls some family member nearly every day and he regularly receives money from home. Santo also has the support of his extended family. When the attorneys and mitigation specialist visited Santo's family for the first time, 22 family members came to Santo's parents' home to help in whatever way they could. Santo's parents are in the process of buying their first home which will provide additional stability to the family and to Santo upon his release.

Santo's son Ayden is six years old. Ayden, Santo, and Ayden's mother lived with Santo's family prior to Ayden's birth and until Ayden was two years old. Santo's parents built a strong bond with Ayden and his mother during that time. Now, Santo's dad Hilario takes Ayden to school every morning. They play baseball together and Hilario is a coach of Ayden's little league team. Santo saw Ayden every weekend after his arrest until Santo was moved to Kankakee. Kankakee does not offer in-person visits. In Santo's nearly daily calls to his parents, he hopes to connect with his son Ayden, who is often with Santo's parents.

Santo is also the father of Yandel Cuevas. Yandel was born on March 2, 2017, six days before Santo Lozoya was arrested in this case. Santo was at the hospital shortly after he was born. Yandel is now 4 years old. Santo has almost daily contact with Yandel's mother, Isaly Cuevas. Ms. Cuevas works at the airport as a clerk.

> **(2) the need for the sentence imposed--**
>
> **(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**
>
> **(B) to afford adequate deterrence to criminal conduct;**

> **(C) to protect the public from further crimes of the defendant; and**
> **(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

The serious nature of the offense cannot be minimized. No attempt to do so has ever been made by Santo and no attempt to do so will be made here. The plea agreement reflects that seriousness. It requires that Mr. Lozoya spend a significant portion of his life in custody for his actions. He must receive a minimum sentence of 30 years (with the court having discretion to lower his sentence to credit him for his 26 months in state custody awaiting trial on the Coliz murder—see below). Clearly for that period of time he will not be a threat to the public. While in custody, as is stated in his letter, Santo is looking forward to taking as many courses as possible. He wants to take courses in writing, communications, science and social studies. The importance of obtaining as much knowledge as possible was, as is often the case with young people, not a part of him as a young boy. It is now burning in him. He wants to become someone that his two boys can respect and look up to. He wants to be able to guide them into not making the same mistakes he made as a youth.

> **(3) the kinds of sentences available;**

The plea agreement calls for a sentence of between 30-35 years with the court having discretion to lower his sentence to credit him for his 26 months in state custody awaiting trial on the Coliz murder.

> **(4) the advisory guideline range;**

The agreed Offense Level is 40. The plea agreement assigned 4 criminal history

points. Probation has the point total at 6. In either event the Criminal History Level is Category III. Therefore, the guideline range is 360 months to life.

> **(5) any pertinent policy statements issued by the Sentencing Commission;**

None.

> **(6) the need to avoid unwarranted sentence disparities;**

In making the below argument in regards to the Crispin Coliz murder, counsel and Lozoya wish to reiterate that it is not intended in any way to minimize Lozoya's role in the Coliz murder. As is clearly reflected on pages 8 and 9 of the plea agreement, Lozoya was a full-fledged participant in that murder, he fired a shot at the Coliz car intending to kill Coliz, and he accepts full responsibility for the murder of Crispin Coliz. The argument is set forth to establish that Martinez was an equally culpable defendant with Lozoya. It is set forth as another reason why a 30-year sentence (minus 26 months) is the appropriate sentence in this case.

Santo Lozoya was originally indicted along with Jose Martinez, Hector Rojas, and Pedro Navarro. Martinez is a co-defendant with Lozoya in the Crispin Coliz Murder.

The discovery provided by the government establishes that Martinez fired the shot that killed Crispin Coliz. Martinez and another witness in the car with Martinez and Lozoya agree that at the time of the murder Lozoya was the driver of a white Jeep vehicle. Martinez was in the rear passenger seat of that vehicle. At the time of the shooting, the Jeep pulled up so that the passenger side of the Jeep was next to the driver's side of a black Cadillac Escalade being driven by Coliz (i.e. the vehicles were facing in the same direction). According to Martinez, Lozoya fired a shot from the driver's

10

side window of the Jeep across the windshield of the Jeep towards the Escalade. <u>After that shot was fired</u>, Coliz fired a shot out of the driver's side of his vehicle. Martinez then fired multiple shots at Coliz from his position feet away from Coliz (P.A. pg. 9) Coliz died from a single gunshot wound to the head. The fact that Martinez was the only person who fired after Coliz fired his weapon means that the shot fired by Lozoya across his car's windshield did not kill Coliz. One of the multiple shots fired by Martinez caused Coliz's death.

Martinez was 23 at the time of the Coliz murder. Lozoya (as discussed below) was 19. Martinez's Offense Level is 40. His Criminal History Category is IV. Therefore, his guidelines range is 360 months to life. Martinez cooperated with the government. His original plea agreement called for a custodian sentence of between 20-25 years. However, in the continuation of the government's investigation of the MKs, it was determined that Mr. Martinez falsely stated to the government and to the grand jury that he had not fired shots at the victim in a murder case and that he had not fired shots at the victim in another shooting when in truth he had fired at the victims in both cases. As a result of his false statements and testimony, Mr. Martinez's original plea agreement was changed to a custodial sentence of between 25-40 years.

On September 2, 2015, Hector Rojas sought revenge for the killing of a MK by a member of the Maniac Latin Disciples Street Gang. On that day he was alerted that an MLD, Daniel Guerra, had been sited and already beaten by a MK. Rojas got a gun and drove to the location where Guerra was last seen. Rojas found Guerra in a store parking lot. He opened fire killing Guerra and wounding two other persons.

11

Rojas was 23 at the time of the Guerra murder. His offense level is 40. His Criminal History Category is VI. Therefore, his guideline range is 360 months to life. He cooperated with the government.

Rojas' plea agreement calls for a custodian sentence of 20 years.

On April 27,2017, Pedro Navarro and two other persons were riding in Navarro's car. Navarro was the driver. As they were riding, one of the persons in the car spotted a group of people in an alley and told Navarro to drive into the alley so he could determine whether the people in the alley were rival gang members. Both people in Navarro's car possessed guns. When Navarro pulled into the alley he did so knowing one of his passengers was going to shoot the individuals in the alley. Once it was believed by the people in Navarro's car that the people in the alley were gang members, Navarro slowed down his vehicle so that his passengers could get out of the vehicle and shoot the victims. That is what happened. During the shooting a fifteen-year- old boy, Xavier Soto, was killed and a second victim was shot three times.

Navarro was 20 at the time of the shooting. His Offense Level is 42. His Criminal History Category is I. Therefore, his guideline range is 360 months to life.

Navarro cooperated with the government. His plea agreement calls for a custodial sentence of between 22-29 years.

Counsel for Lozoya are aware that the distinguishing factor between the custodial period in Lozoya's plea agreement and the plea agreements in Rojas', Navarro's and Martinez's cases is the cooperation factor. Even with that factor in mind, their plea

12

agreements lend support to a sentence of 30 years for Santo Lozoya (minus 26 months).

Hector Rojas, acting alone, shot and killed one person and shot and wounded two other people. His Criminal History Category is VI. A ten-year gap between the 20 year sentence he is to receive and a 30 year sentence asked for on behalf of Santo Lozoya would seem to more than adequately account for his cooperation.

Pedro Navarro will receive a sentence of between 8 and 4 years less than the asked for 30-year sentence for Lozoya. Again, the difference in the two sentences adequately takes into account his cooperation.

As to the Martinez amended agreement, Lozoya will be sentenced before Martinez so it is unknown what Martinez's sentence will be. What is know is that Martinez fired the shot that killed Crispin Coliz, that Martinez lied to the government during his proffers, and that Martinez lied under oath to the grand jury. Still he is eligible to receive a sentence of 25 years.

Whatever determination the court arrives at concerning Mr. Martinez, it is urged that a fair sentence for Mr. Lozoya is 30 years (minus 26 months).

**(7) the need to provide restitution to any victims of the offense.**

Not applicable.

## II. Additional factors

### a) Age

**Santo Lozoya was 19 at the time of the charged VICAR Murder Count**

The Supreme Court in the case of *Roper v. Simmons*, 543 U.S. 551 (2005) was presented with the issue of whether a person under the age of 18 could be sentenced to death. While Santo Lozoya is not facing the death penalty and while he was 19 at the

13

time of the Coliz murder, the pronouncements of the court on the issue of the mental development of a teenager are instructive as to why youth should be considered by a sentencing court in determining a fair and just sentence.

The Court in *Roper* relied on research presented in the case that revealed factors mitigating against the death penalty. Those same factors apply to the sentence to be imposed upon Lozoya. The Court noted the following three factors: (1) the lack of maturity and an underdeveloped sense of responsibility is found in youth more often than in adults and is more understandable among the young; (2) juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure; and (3) the character of a juvenile is not as well formed as that of an adult.

The *Roper* Court acknowledged that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." Research reveals that a child's brain capacity for self-regulatory competency is not complete until their mid-20s. In fact, the brain of 18-21 year-olds are not mature in the three areas that impact self-control and emotional regulation: the amygdala, the prefrontal cortex, and the ventral striatum. Brain scans illustrate that the amount of gray matter in the brain does not peak until mid-20s. Only in the late 20s do people's capacity to integrate higher thought processing finally peak.[1]

The *Roper* Court, importantly, gave weight to the fact that:

"the relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside…(citations

---

[1]) Nitin Gogtay et al., Dynamic Mapping of Human Cortical Development During Childhood Through Early Adulthood, 101:21 PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCE 8174 (2004).

14

omitted) For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood." *Roper* at 571.

The case of Santo Lozoya repeats a scenario that counsel and this honorable court have unfortunately seen over and over during their years of practice. Santo Lozoya's life reflects the findings expounded in *Roper*: A young boy growing up in a tough neighborhood. Failing in school and not receiving the type of help that might have turned his school experience around. More humiliated than encouraged at school, seeking the acceptance of a peer group, he turned to the gangs that surrounded him and sought relentlessly to recruit him. Soon he was committing crimes and at age 19, when at most he possessed a modicum of maturity, he committed the act that now will cause him to spend a major portion of his life in prison.

Counsel have been working with Santo for over two years. He has always been extremely respectful. Despite his incarceration, he maintains a positive outlook, never blames others for his situation, and is looking forward to changing his life while in custody. He talks freely about the courses he wishes to take once he is settled in the BOP. His letter to the court is the best evidence of his road towards progress.

### b. Miscellaneous

1. The Plea Agreement states that "… the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of prisons of not less than 30 years and not more than 35 years, which the Court shall have discretion to reduce below 30 years imprisonment only to account for time defendant

15

has served in the matter of *People of the State of Illinois v. Santo Lozoya*, Cook County case number 17 CR 0548901 ( P.A.pg. 15)." Mr. Lozoya was taken into state custody on March 8, 2017, for the Coliz murder. He was transferred into federal custody on May 9, 2019. He was therefore in state custody for two years and sixty-one days.

> Title 18 U.S.C. § 3585(b) provides:
>
> A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences--(1) as a result of the offense for which the sentence was imposed; or (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed; that has not been credited against another sentence.

18 U.S.C. § 3585(b).

Counsel for Lozoya recently attended a seminar in which one of the topics was the BOP assignment of credit for time served. There are rules that the BOP attempts to follow, however, there also appears to be a lack of certainty that what the court intended as the in-custody portion of a sentence actually winds up being the same sentence as interpreted by the BOP.

Counsel, in an attempt to make sure the BOP would credit Lozoya with the 26 months he served in the Cook County Jail on the state Coliz murder charge, contacted personnel from the BOP. The response indicated that "per Title 18 U.S.C. 3585(b), if the time in question has not been credited to any other sentence, then the BOP will apply that credit to the federal sentence. Whether prior custody credit should be awarded is a matter that is in the BOP's sole discretion and should not be included in the judgment. (See United States v.

16

Wilson, 503 U.S. 329, 334 (1992)…"The response also indicated that Lozoya would not receive any credit for good time on the time in Cook County Jail.

Probation Officer Kelly Kwong informed counsel that her 30-year recommendation did not factor in the time Lozoya served in state custody due to the difficulty in knowing with certainty how the BOP will deal with the 26 months in state custody.

Due to the above, counsel for Lozoya respectfully request that the court sentence Lozoya to an in-custody sentence of 334 months (27 years and 10 months) and that the court indicate in the Judgment and Commitment Order that no credit should be given for time spent in state custody on the case of *People of the State of Illinois v. Santo Lozoya*, Cook County case number 17 CR 0548901, as that time has already been factored into the sentence imposed. This procedure best insures that Lozoya receives credit for the time he spent in custody on the Coliz murder without creating the possibility of him receiving double credit for that time.

2. The PSR on page 20 details Mr. Lozoya's history of drug abuse. At sentencing counsel will seek a recommendation from the court that when Mr. Lozoya becomes eligible for the Residential Drug Abuse Program he be placed in that program.

3. Counsel will seek a recommendation from the court that Mr. Lozoya be placed in custody at FCI Oxford. The location of that facility would afford his family the opportunity

17

to visit him as often as possible. It also has an RDAP program.

                                          Respectfully Submitted,
                                          /s/Keith Spielfogel
                                          190 S. LaSalle Street
                                          Suite 1540
                                          Chicago, Illinois 60603
                                          (312) 236-6021
                                          spielfogel@sbcglobal.net
                                          IL 2689537


                                          /s/James Graham
                                          53 W. Jackson Blvd.
                                          Suite 703
                                          Chicago, IL 60604
                                          (312) 922-3777
                                          jgraham.law@me.com